IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| GARY E. ALLISON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:05-CV-510-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | |
| PRISON HEALTH SERVICES, INC.; | ) | |
| LARRY HYNES; CORRECTIONAL | ) | |
| MEDICAL SERVICES, INC.; TED | ) | |
| LUCAS; and ROBIN BABBITT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before the Court are Motions for Summary Judgment filed by Defendants

Correctional Medical Services, Inc. ("CMS") and Prison Health Services, Inc. ("PHS")

(Docket Nos. 63 and 64). Also before the Court is Plaintiff's Motion to Strike Defendant

CMS's Reply Memorandum in support of its Motion for Summary Judgment (Docket No.

68).

Having fully reviewed the record, the Court finds that the facts and legal

arguments are adequately presented in the briefs and record. Accordingly, in the interest

of avoiding further delay, and because the Court conclusively finds that the decisional

process would not be significantly aided by oral argument, this matter shall be decided on

the record before this Court without oral argument. D. Idaho L. R. 7.1. For the reasons

that follow, this Court concludes that Plaintiff's medical care was adequate under the

Eighth Amendment and that Defendants are entitled to summary judgment.

**MEMORANDUM ORDER  1**

## BACKGROUND

Plaintiff is a prisoner in the custody of the Idaho Department of Correction (IDOC).  Defendants PHS and CMS are private medical care providers that are or were under contract with the IDOC to provide health care to prisoners.  Plaintiff has also sued Ted Lucas, Larry Hynes, and Robin Babbitt, individual health services administrators, although these Defendants have not been served.  Plaintiff argues that the medical care he received at the prison constituted a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

Defendants CMS and PHS have filed Motions for Summary Judgment (Docket Nos. 63 and 64).  In addition, Plaintiff has filed a Motion to Strike Defendant CMS's Reply Brief in Support of its Motion for Summary Judgment (Docket No. 68).

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff claims that Defendant CMS's Reply Brief was not timely filed and asks that it be stricken.  However, the Reply Brief was filed within the time limits set by this Court.  Therefore, the Court will deny Plaintiff's Motion to Strike and consider all submissions by all parties.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed.

**MEMORANDUM ORDER  2**

R. Civ. P. 56(c).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48.  Material facts are those that may affect the outcome of the case.  *See id.* at 248.

The moving party bears the initial burden demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence, but may simply point out the absence of evidence to support the non-moving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his or her favor.  *Id.*  The non-moving party must go beyond the pleadings and show by affidavits or by discovery or disclosure materials that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c).  *See also Celotex*, 477 U.S. at 324.

### B.   Section 1983 Standard

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute.  To state

**MEMORANDUM ORDER  3**

a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).[1] Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Plaintiff asserts that Defendants have violated his Eighth Amendment right to have adequate medical care in prison. To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

---

[1] The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

**MEMORANDUM ORDER  4**

failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (quotation omitted).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a

**MEMORANDUM ORDER  5**

substantial risk of serious injury," summary judgment in favor of the defendants is proper. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

   In order to succeed on his claims against CMS and PHS as entities, Plaintiff must meet the test articulated in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691-94 (1978).[2]  Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).  An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" policy. *Monell*, 436 U.S. at 691.  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  An entity is not liable under § 1983 merely because its employee violated a constitutional right.

   Therefore, in order to prevail against PHS or CMS, Plaintiff must show not only that he received inadequate medical care, but that such medical care was undertaken

---

   [2] *See also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (cataloging circuit court cases applying *Monell* to private entities).

**MEMORANDUM ORDER  6**

pursuant to a policy or custom amounting to deliberate indifference.

### C.    Factual Background

This section includes facts that are undisputed and material to the resolution of the issues in this case.  Where material facts are in dispute, the Court has included Plaintiff's version of the facts, insofar as the version is not contradicted by clear documentary evidence in the record.

Plaintiff is a prisoner in the custody of the Idaho Department of Correction (IDOC).  Defendants PHS and CMS are private medical care providers under contract with the IDOC to provide health care to prisoners.  Plaintiff has also sued Ted Lucas, Larry Hynes, and Robin Babbitt, individual health services administrators, although these Defendants have not been served.

Plaintiff injured his right foot on April 26, 2005, when he slipped on a wet floor.  Comprehensive Amended Complaint (Docket No. 40) ("Amended Complaint") at 2.  Two days later, Dr. Jo Elliott-Blakeslee examined Plaintiff, recommended the use of crutches, and prescribed ibuprofen[3] and Vicodin.[4]  Affidavit of David Tomey (Docket No. 64-4) ("Tomey Affidavit") at ¶ 3.

---

[3] Ibuprofen, a "non-steroidal anti-inflammatory drug[]" or NSAID, "is used to reduce fever and treat pain or inflammation caused by many conditions such as headache, toothache, back pain, arthritis, menstrual cramps, or minor injury."  http://www.drugs.com/ibuprofen.html.

[4] Vicodin is a "combination of acetaminophen and hydrocodone.  Hydrocodone is in a group of drugs called narcotic pain relievers.  Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  Vicodin is used to relieve moderate to severe pain." http://www.drugs.com/vicodin.html.

**MEMORANDUM ORDER  7**

Dr. Elliott-Blakeslee also ordered X-rays of Plaintiff's foot, but the X-rays were not taken until May 18, 2005.  Plaintiff states that several weeks after his initial examination with Dr. Blakeslee, an officer in the visitation area noticed Plaintiff's foot and asked Plaintiff about it.  Plaintiff stated that he had not yet received any X-rays.  The officer then called an unidentified person about Plaintiff, and Plaintiff's X-rays were taken the next morning.  Amended Complaint at 2-3.  David Tomey, a physician's assistant, has stated that the most likely reason for the delay in performing the X-rays was either that (1) Plaintiff was unavailable, (2) the X-ray technician was unavailable, or (3) medical staff believed the X-rays had already been taken.  P.A. Tomey states that the delay was not intentional.  *Id.* at ¶ 6.

P.A. Tomey saw Plaintiff on May 19, 2005.[5]  P.A. Tomey found no deformity of Plaintiff's foot, although there was some bruising that was resolving and the foot was tender.  Plaintiff had a full range of motion in his ankle.  Believing that Plaintiff might have a fracture of the navicular bone, P.A. Tomey ordered that Plaintiff be given a cast and that he remain on crutches to avoid bearing weight on his foot.  *Id.* at ¶ 4.  According to Dr. Robert Jones, Defendant PHS's expert, placing Plaintiff's foot in a cast at this point was unnecessary but not inappropriate, and it was not harmful.  Affidavit of Dr. Robert Jones (Docket No. 64-5) at ¶¶ 13-14.

---

[5] P.A. Tomey testified that the X-ray results were not available on May 19th.  Plaintiff states that P.A. Tomey showed him the X-rays at this examination and told him that he had "definitely" fractured his foot but that the fracture had already healed.  Amended Complaint (Docket No. 40) at 3.  For purposes of summary judgment, the Court uses Plaintiff's statement of events.

**MEMORANDUM ORDER  8**

Plaintiff's foot remained in the cast until P.A. Tomey examined Plaintiff on June 7, 2005 and noted that the radiograph report of the X-ray showed no fracture. Plaintiff's cast had been abused and was soft from water. At this point, suspecting soft tissue injury rather than a fracture, P.A. Tomey removed the cast. P.A. Tomey's recommended course of treatment was that Plaintiff begin putting weight on his foot so that it could heal properly. Tomey Affidavit at ¶ 5.

The medical records reflect that in August of 2005, Plaintiff was seen by P.A. Tomey for pain in his *left* foot. The records indicate that P.A. Tomey ordered various medications, a wheelchair, and nocturnal plantar fascia[6] splints for Plaintiff's left foot. Affidavit of Dr. April Dawson (Docket No. 63-5) ("Dawson Affidavit"), Exhibit B at HFOB 67. Plaintiff asserts that there is a mistake in the medical records, as his pain has always been in his *right* foot, and that he never received the nocturnal plantar fascia splints ordered by P.A. Tomey. Plaintiff's Answer to Defendants' Request for Summary Judgment (Docket No. 66) at 1-2.

Plaintiff saw Dr. Maria Yurasek in September 2005. Dr. Yurasek ordered gel cups for Plaintiff's right heel and prescribed Vicodin. Vicodin was again ordered for Plaintiff in November of 2005, as was a wheelchair. Dawson Affidavit at ¶¶ 12-13. Plaintiff did not receive the gel heel cups ordered by Dr. Yurasek. Amended Complaint at 4.

After Plaintiff was transferred to Idaho Correctional Center on November 29,

---

[6] The plantar fascia is a band of tissue extending from the heel to the toes. http://www.footphysicians.com/footankleinfo/heel-pain.htm.

**MEMORANDUM ORDER  9**

2005, Dr. Steven W. Garrett (who was not under contract with CMS) injected the

analgesic Depo-Medrol[7] into Plaintiff's foot.  In an attempt to get Plaintiff off of the

Vicodin, Dr. Garrett ordered Naprosyn[8] for Plaintiff's pain.  Dr. Garrett also ordered an

arch support for Plaintiff's right foot.  Dawson Affidavit at ¶ 14.

     Upon Plaintiff's return to ISCI in December 2005, Plaintiff was evaluated several

times.  Although Plaintiff still reported pain in his foot, medical staff noted no

discoloration and a normal range of motion.  Dr. Yurasek prescribed Ultram[9] and

recommended continued use of the wheelchair on January 11, 2006.  *Id.* at ¶ 15.  Dr.

Yurasek's notes of that examination state that Plaintiff had not received the gel inserts

previously ordered.  Noting that Plaintiff was scheduled to see a specialist in two days,

however, Dr. Yurasek did not re-order the gel inserts or any other type of assistive device.

Dr. Yurasek wrote that Plaintiff "needs to be seen by podiatrist before splint will be

ordered at this time."  *Id.*, Exhibit B at HFOB 80.

     Dr. Shane York, a podiatrist at the Walking Center, examined Plaintiff on January

13, 2006 in an off-site consultation.  Dr. York diagnosed Plaintiff with tarsal tunnel

---

[7] Depo-Medrol "is a corticosteroid.  It works by modifying the body's immune response and decreasing inflammation."  http://www.drugs.com/cdi/depo-medrol-suspension.html.

[8] Naprosyn "is used to treat pain or inflammation caused by conditions such as arthritis, ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps."  Naprosyn is an NSAID pain reliever.  http://www.drugs.com/naprosyn.html.

[9] Ultram "Ultram is a narcotic-like pain reliever.  Ultram is used to treat moderate to severe pain."  http://www.drugs.com/ultram.html.

**MEMORANDUM ORDER  10**

syndrome[10] with inferior calcaneal bursitis,[11] as well as an Achilles tendon contracture.[12] Dr. York injected Lidocaine[13] and Depo-Medrol into Plaintiff's right tarsal tunnel region. Dr. York also noted that an ankle foot orthotic device would be required "if the injection fails to provide long term relief."  *Id.*, Exhibit B at HFOB 208.

In February of 2006, a new X-ray of Plaintiff's foot showed no abnormality.  Dr. Gregory Schweiger, another off-site provider at Orthopaedic Associates, examined Plaintiff on March 8, 2006.  Dr. Schweiger noted that there were no fractures in Plaintiff's foot and that the X-rays were normal, but that Plaintiff's pain could have gotten worse because he was not stretching or putting any weight on his foot.  Dr. Schweiger's recommended course of treatment was stretching of the Achilles tendon and calf muscle.  Dr. Schweiger noted that Plaintiff did not appear pleased with this approach.  *Id.* at ¶¶ 17-18.

---

[10] "Tarsal tunnel syndrome is a compression, or squeezing, on the posterior tibial nerve that produces symptoms anywhere along the path of the nerve.  The posterior tibial nerve runs along the inside of the ankle into the foot.  Tarsal tunnel syndrome is similar to carpal tunnel syndrome, which occurs in the wrist.  Both disorders arise from the compression of a nerve in a confined space."  http://www.footphysicians.com/footankleinfo/tarsal-tunnel-syndrome.htm.

[11] "Bursitis is painful inflammation of a bursa (a flat sac containing joint (synovial) fluid that reduces friction in areas where skin, muscles, tendons, and ligaments rub over bones)."  Bursitis can develop at the inferior calcaneus, or the "bottom of the heel."  http://www.merck.com/mmhe/sec05/ch072/ch072g.html.

[12] An Achilles tendon contracture is a "fixed tightening" of the Achilles tendon that "prevents normal movement."  http://www.medhelp.org/medical-information/ show/3358 /Contracture-deformity.

[13] Lidocaine is a local anesthetic.  http://www.mayoclinic.com/health/drug-information /DR601515.

**MEMORANDUM ORDER  11**

Dr. April Dawson, a prison doctor, examined Plaintiff on June 28, 2006.  Plaintiff stated that his foot was still painful but that no new trauma had occurred.  Dr. Dawson reviewed the notes from Plaintiff's podiatry evaluation in January of 2006 and consulted with Dr. York of the Walking Center regarding the use of an orthotic device.  The record does not disclose the substance of this consultation.  Dr. Dawson testified that at the time of Plaintiff's June 28 evaluation, she suspected pain exaggeration and drug-seeking behavior on Plaintiff's part.  *Id.* at ¶ 19.

Plaintiff again went to the Walking Center for an evaluation on July 28, 2006.  There, Dr. William Stano noted that Plaintiff suffered from tarsal tunnel syndrome.  Dr. Stano recommended a brace or a tarsal tunnel release.  However, Dr. Stano left the final treatment decision up to prison medical staff.  He stated, "The circumstances may be modified on the recommendations, given his status, but we will let the facility physician Maria Murasek [sic], M.D. make the final decision and I will stay available for them."  *Id.*, Exhibit B at HFOB 213.

Dr. Dawson did not have Dr. Stano's notes or recommendations at the time of her next evaluation of Plaintiff on August 21, 2006, approximately three weeks later.  Dr. Dawson's notes indicate that she recommended NSAIDs and that she would again check with a podiatrist.  On October 2, 2006, the day of Plaintiff's next follow-up examination and in response to Plaintiff's continued pain, Dr. Dawson consulted with Dr. Stano.  During this consultation, Dr. Stano recommended to Dr. Dawson that Plaintiff be given an ankle foot orthotic device, for which Plaintiff was fitted on November 20, 2006.  On

**MEMORANDUM ORDER  12**

January 5, 2007, Plaintiff received the custom orthotic device.  *Id.* at ¶¶ 21-22.  This was approximately one year after the first notation in Dr. York's notes regarding the possibility of orthotics as a potential treatment for Plaintiff's foot.  During this period of time, Plaintiff was receiving the alternate treatment described above in the form of pain medications, injections, and stretching exercises.

P.A. Amy Hoger examined Plaintiff on February 19 and February 26, 2007.  P.A. Hoger's notes state that Plaintiff's orthotic device "often needs adjustment to be most effective" and that Plaintiff required a follow-up appointment.  *Id.*, Exhibit B at HFOB 111.  Plaintiff was again referred to the Walking Center, where Plaintiff was apparently examined by Scott Pixley on March 23, 2007.  The notes from this evaluation reflect that Plaintiff was receiving some relief from the pain as a result of his wearing the orthotic device.  *Id.*, Exhibit B at HFOB 218.

Plaintiff continued to seek medical attention for pain in his foot.  On May 21, 2007, Plaintiff saw P.A. Amy Hoger for foot cramping.  P.A. Hoger showed Plaintiff how to perform stretches that would ease the cramping.  Throughout 2007 and 2008, medical staff at the Walking Center adjusted Plaintiff's orthotic device several times.  Plaintiff was given extra-deep shoes to accommodate the orthotics.  *Id.* at ¶ 24.

Plaintiff has had other medical problems as well.  Dr. Dawson evaluated Plaintiff on March 5, 2008 for back and knee pain potentially caused by Plaintiff's foot problems.  Dr. Dawson noted that her objective findings did not support Plaintiff's subjective report of pain because Plaintiff had a full range of motion in his back and knees and could touch

**MEMORANDUM ORDER  13**

the floor without pain.  Dr. Dawson did order a new set of X-rays, this time for Plaintiff's

spine and hip, and prescribed Tylenol and ibuprofen.  The X-rays showed no

abnormalities in Plaintiff's back or hip.  *Id.* at ¶¶ 25-26.

> **D.     Defendants were not deliberately indifferent to Plaintiff's medical needs.**

Defendants do not dispute that Plaintiff has a serious medical need.  However,

Defendants have met their burden of demonstrating that the medical care that Plaintiff

received was adequate under Eighth Amendment standards.  There is nothing in the

record to indicate that medical staff—much less PHS or CMS—were deliberately

indifferent to Plaintiff's medical needs.

> **1.     Defendant PHS**

Plaintiff was injured on April 26, 2005.  PHS ceased providing medical services to

IDOC on July 11, 2005.  Therefore, any Eighth Amendment violations by PHS would

have to have occurred between those dates.

Plaintiff's only complaint for the period during which PHS provided medical care

was the delay in the original X-rays.  Although the X-rays were not performed until

several weeks after Plaintiff's injury, P.A. Tomey offered several potential reasons for the

delay: Plaintiff or the X-ray technicians could have been unavailable, or the technicians

could have mistakenly believed that the X-rays had already been performed.  None of

these reasons is indicative of deliberate indifference to Plaintiff's medical needs.  In fact,

when medical staff realized that the X-rays had not yet been performed, Plaintiff received

**MEMORANDUM ORDER  14**

the X-rays the next day.  Plaintiff has not disputed any of P.A. Tomey's proffered reasons

for the delay in X-rays.  Therefore, Plaintiff has not rebutted PHS's evidence that PHS

was not deliberately indifferent to Plaintiff's serious medical needs, and summary

judgment in favor of PHS is proper.

> 2.   Defendant CMS

With respect to the medical care provided after July 11, 2005 (when Defendant

CMS took over the provision of health care services), Plaintiff was examined many times

by medical staff, both in the prison and off-site.  Plaintiff's amended complaint states that

prison medical staff "ignore [his] needs" and that he has not been seen by a specialist.

Amended Complaint, Docket No. 40) at 4.  Plaintiff also states that Defendants' actions

constituted a "complete failure . . . to provide any positive medical treatment for

Plaintiff."  *Id.* at 5.  These statements are not supported by the record.  Indeed, the

evidence shows that medical staff were consistently responsive to Plaintiff's requests for

medical care.  They provided him with crutches and a wheelchair and referred him

numerous times to off-site evaluations at the Walking Center, as well as a consult at

Orthopaedic Associates.  Plaintiff was prescribed various pain medications, received

injections in his foot, and instructed in stretches to relieve his foot pain.  The evidence

shows that medical staff were consistently attempting to relieve Plaintiff's pain and tried

numerous different treatments in order to do so.

Because Defendants have met their initial burden, it is up to Plaintiff to show that

his treatment constituted deliberate indifference.  First, Plaintiff argues that CMS staff

**MEMORANDUM ORDER  15**

were deliberately indifferent when they failed to provide him with the gel inserts initially ordered by Dr. Yurasek in November of 2005.

The record does not disclose the reasons for the failure to provide Plaintiff with the gel inserts at that time. However, this failure does not constitute deliberate indifference. When Dr. Yurasek realized the gel inserts had not been ordered, she did not prescribe them again. Rather, at that time she believed Plaintiff should not receive the gel inserts prior to his scheduled appointment with the podiatrist.

Plaintiff also asserts that the failure to provide him with the foot splints ordered by P.A. Tomey constituted deliberate indifference. The record reveals that P.A. Tomey ordered nocturnal plantar fascia splints for Plaintiff's *left* foot on August 17, 2005. Plaintiff did not receive any such splints, for either foot. The Court will assume that Plaintiff is correct in his assertion that the medical notation stating Plaintiff complained of pain in his left foot is a mistake in the records. All other medical records indicate that Plaintiff's problems have been in his right foot. However, Plaintiff has still not pointed to any evidence that the failure to provide him with splints after the August 17, 2005 appointment was a result of deliberate indifference instead of a mere mistake.

Plaintiff also argues that it took one year to receive his orthotic device after Dr. York initially recommended it and that this constitutes deliberate indifference. Although Plaintiff asserts that medical staff ignored Dr. York's and Dr. Stano's recommendations for orthotics, these doctors both indicated that other treatments could be effective. At Plaintiff's first podiatry appointment, Dr. York determined that an injection was the best

**MEMORANDUM ORDER  16**

course of action and that orthotics would be necessary only if the injection failed to provide long-term relief.  Therefore, after the podiatrist's initial evaluation and until it was clear that the chosen treatment had not worked, there was no reason to provide the ankle foot orthotic or any other type of device.  Finally, when recommending an ankle brace in July of 2006, Dr. Stano himself stated that the final treatment decision would be up to prison medical staff.  The decision to fit Plaintiff with an orthotic device was not made until Dr. Dawson consulted with Dr. Stano in October of 2006.  Providing Plaintiff with medications, injections, and stretching exercises rather than orthotics was a choice between different types of treatment made by medical personnel in the exercise of professional medical judgment.

Even though Plaintiff believes that the orthotic device was a better treatment, this is insufficient to maintain a claim of an Eighth Amendment violation.  Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  "[T]o prevail on a claim involving choices between alternative courses of treatment, [Plaintiff] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk'" to Plaintiff's health.  *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996).  There is simply no evidence that the chosen treatment was medically unacceptable or that medical staff consciously disregarded an excessive risk.

**MEMORANDUM ORDER  17**

Defendants have met their burden of showing that they were not deliberately indifferent because in the period of time between Dr. York's first evaluation of Plaintiff in January of 2006 and Dr. Dawson's prescription of orthotics in October of 2006, Plaintiff's doctors were waiting to see if the treatment of injection, medication, and stretching would work.  Dr. Dawson consulted with the doctors at the Walking Center on more than one occasion, showing that she did try to determine the best course of treatment for Plaintiff.  The record reflects that Plaintiff's foot condition was difficult to diagnose and to treat, requiring numerous different doctors and other medical staff and many examinations both at the prison and at off-site specialty facilities.  Medical staff were "consistently responsive" to Plaintiff's foot problems.  *Toguchi v. Chung*, 391 F.3d at 1061.

Because Plaintiff has not demonstrated a genuine issue of material fact as to whether his treatment constituted deliberate indifference, Defendant CMS is entitled to summary judgment on Plaintiff's Eighth Amendment claims.

**E.   Plaintiff cannot show that Defendants PHS or CMS had a custom or policy amounting to deliberate indifference to Plaintiff's medical needs.**

The motions of Defendants PHS and CMS must be granted for another reason. Even if Plaintiff's course of treatment constituted deliberate indifference on the part of the medical staff examining Plaintiff—which it did not—this would not show that *PHS or CMS* was deliberately indifferent to Plaintiff's serious medical needs.

PHS and CMS cannot be held liable under § 1983 unless they had "permanent and

**MEMORANDUM ORDER  18**

well settled" policies amounting to deliberate indifference.  *Monell*, 436 U.S. at 691.

There is no evidence of any such policy or custom on the part of PHS or CMS.  Plaintiff

states that Defendants have refused to provide Plaintiff with "said policys [sic] and

customs."  Plaintiff's Response to Defendants' Motions for Summary Judgment (Docket

No. 66) at 3.  However, on August 26, 2008, this Court ordered the parties to meet and

confer in an attempt to resolve their discovery dispute.  Defendant CMS filed a certificate

of compliance on September 26, 2008, certifying that it had served Plaintiff with

supplemental discovery responses following the meet and confer session.  Plaintiff did

not raise any issue with respect to those discovery responses until he filed his response

brief to Defendants' Motions for Summary Judgment, nor has he moved to compel any

further responses from any Defendants.  There is nothing in the record to indicate that

Defendants did not provide Plaintiff with requested discovery.

Defendants PHS and CMS have adequately shown the lack of a custom or policy

amounting to deliberate indifference to Plaintiff's medical care.  Having failed to set forth

evidence of such a custom or policy, Plaintiff has failed to raise a genuine issue of

material fact on this issue.  Thus, Defendants PHS and CMS are entitled to summary

judgment on this ground as well.

## III.    Individual Defendants

Since filing his Amended Complaint over a year ago on November 2, 2007,

Plaintiff has not proceeded against the individual Defendants.  Plaintiff did not provide

the Court with the addresses of these Defendants or otherwise proceed against them.

**MEMORANDUM ORDER  19**

Plaintiff was notified by PHS that it was not accepting service or otherwise providing a defense on behalf of Defendants Hynes and Babbitt.  *See* PHS's Waiver of Service of Summons (Docket No. 44) ("This Waiver of Service of Summons extends only to Defendants Prison Health Services, Inc.  The undersigned attorney lacks authority to waive service of summons for Defendants Larry Hynes or Robin Babbitt").

There are no factual allegations in the Complaint (or elsewhere in the record that the Court can see) specifying any particular acts or omissions of Defendants Hynes, Lucas, or Babbitt.  Plaintiff alleges only that these Defendants "were directly responsible for providing reasonable prison medical services to the Plaintiff" and that they "knew or should have known that the medical treatment of . . . Plaintiff were [sic] grossly inadequate."  Amended Complaint (Docket No. 40) at 5.  However, vague and conclusory allegations of official participation in civil rights violations are not sufficient to state a § 1983 claim.  *See Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).  Further, a state actor cannot be liable simply because of the position he or she holds because there is no respondeat superior liability under § 1983.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  As a result, the claims against Defendants Lucas, Hynes, and Babbitt will be dismissed.

## CONCLUSION

Plaintiff has not brought forth sufficient evidence to prevail on his policy-based claims against Defendants PHS and CMS.  The medical care that Plaintiff received was adequate under the Eighth Amendment.  Contrary to Plaintiff's assertion that his

**MEMORANDUM ORDER  20**

treatment "constituted a course of medical care so clearly inadequate as to amount to refusal to provide essential care," Amended Complaint at 5, Plaintiff's course of treatment was entirely appropriate.  Indeed, Plaintiff received better treatment than many people outside of prison could expect.  *See Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993) ("A page-by-page review of Handy's medical records indicates a degree of medical treatment which would be envied by the majority of the adult population of this country which is not incarcerated.").  There was no policy or custom on the part of PHS or CMS that amounted to deliberate indifference to Plaintiff's medical needs.  Therefore, the Motions for Summary Judgment filed by Defendants PHS and CMS will be granted, and Plaintiff's claims against Defendants Lucas, Hynes, and Babbitt will be dismissed.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiff's Motion to Strike (Docket No. 68) is DENIED.

IT IS FURTHER HEREBY ORDERED that Defendant CMS's and Defendant PHS's Motions for Summary Judgment (Docket Nos. 63 and 64) are GRANTED.

**MEMORANDUM ORDER  21**

IT IS FURTHER HEREBY ORDERED that Plaintiff's claims against Ted Lucas,

Larry Hynes, and Robin Babbitt are DISMISSED.

DATED: **January 28, 2009**

<del>Honora</del>ble Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER  22**